# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| DANNY and LISA STEPHENS | § | |
| | § | Civil Case No. _____ |
| Plaintiffs, | § | |
| | § | **COMPLAINT** |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| MONSANTO COMPANY, | § | |
| | § | |
| Defendant. | § | |

Plaintiffs, Danny and Lisa Stephens ("Plaintiffs"), by and through Plaintiffs' undersigned counsel, hereby bring this Complaint for damages against Defendant Monsanto Company. It is intended that this action be transferred to the pending MDL 2741, In *Re: Roundup Products Liability Litigation*.

## INTRODUCTION

1.      This is an action for damages suffered by Plaintiff Danny Stephens ("Plaintiff") as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate. Plaintiffs also sue for Plaintiff Lisa Stephens' loss of consortium damages as a direct and proximate result of Defendant's defective product.

2.      Plaintiffs maintain that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

3.      Plaintiffs' injuries, like those of thousands of similarly situated victims across the country, were avoidable.

4.      On December 13, 2023, The Center for Food Safety (CFS) filed a petition with the EPA on behalf of Beyond Pesticides and four farmworkers groups, including Alianza Nacional de Campesinas, saying glyphosate's registration in the U.S. is illegal.[1] The petition seeks to immediately suspend and cancel all glyphosate registrations. The petition was filed a week after cancer scientists at the NIH published a study in ENVIRONMENTAL HEALTH PERSPECTIVES, that found that male farmers had "markers of genotoxicity" when they reported high levels of glyphosate use.[2] Plaintiff's Complaint cites and incorporates from these recent sources to support Plaintiffs' averments that Roundup is unsafe and caused plaintiff Danny Stephens' Non-Hodgkin Lymphoma.

## JURISDICTION AND VENUE

5.      Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiffs are citizens of Tennessee, a different state than the Defendant's state of citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      Defendant is either incorporated and/or has its principal place of business outside of the state in which the Plaintiff resides. This Court has personal jurisdiction over Monsanto Company ("Monsanto") because Monsanto knows or should have known that its Roundup products are sold throughout the State of Tennessee, and, more specifically, caused Roundup® to be sold to Plaintiffs in the State of Tennessee. In addition, Monsanto maintains sufficient contacts with the State of Tennessee such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

7.      The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

---

[1] Center for Food Safety, PETITION TO CANCEL ALL REGISTRATIONS OF GLYPHOSATE HERBICIDE at 53 (December 13,2 023), available at https://www.centerforfoodsafety.org/files/12-13-23_glycancelpet_final_85692.pdf (hereafter "CFS Petition").
[2] Chang, et al, *Glyphosate Use and Mosaic Loss of Chromosome Y among Male Farmers in the Agricultural Health Study,* Environmental Health Perspectives, Volume 131, Issue 12 (December 6, 2023), available at https://ehp.niehs.nih.gov/doi/10.1289/EHP12834

2

8.      Venue is proper within this District under 28 U.S.C. § 1391(b)(2) because Plaintiffs injuries occurred in and was diagnosed in this District.

## THE PARTIES

### Plaintiffs Danny and Lisa Stephens

9.      Plaintiffs Danny and Lisa Stephens are citizens of Tennessee and reside in Pegram, Cheatham County, Tennessee.  Plaintiff Danny Stephens  was exposed to Roundup® in a variety of product formulations in and around Pegram, Cheatham County, Tennessee. Plaintiff was diagnosed with large B-cell non-Hodgkin's lymphoma ("NHL"), on or about April 2018 in Davidson County, Tennessee.  Plaintiffs did  not know of or discover any link between NHL and Roundup until on or about  September 2019 (from media reports).

### Defendant  Monsanto Company

10.      Defendant Monsanto Company is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Defendant can be served with process upon its registered agent, Corporation Service Company at 2908 Poston Ave, Nashville, TN 37203.

11.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

12.     Plaintiffs bring this action for personal injuries sustained by exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup, Plaintiff  Danny Stephens developed Non-Hodgkin's Lymphoma.

13. "Roundup" refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate, Roundup Power Max, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide,

3

Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to- Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

14.     Defendant MONSANTO COMPANY is collectively referred to as "Monsanto" or "Defendant."

15.     Defendant advertises and sells goods, specifically Roundup, in the State of Tennessee.

16.     Defendant transacted and conducted business that relates to the allegations in this Complaint within the State of Tennessee.

17      Defendant expected or should have expected its acts to have consequences within the State of Tennessee.

18.     Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup and derived substantial revenue from goods and products used in the State of Tennessee.

## FACTS

19.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup.

20.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

4

21. Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based" Roundup" as a broad-spectrum herbicide.

22. Glyphosate is the active ingredient in Roundup.

23. Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

24. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3- phosphate synthase, known as EPSP synthase.

25. Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

26. Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

27. Glyphosate is the most heavily used pesticide in the world. In the United States, approximately 280 million lbs. of glyphosate are applied to 285 million acres in agriculture annually, and an additional 21 million lbs. are applied in non-crop settings.[3] Glyphosate's farm use is four times that of the second leading pesticide, atrazine.[4] Agricultural glyphosate use has

---

[3] CFS Petition at 1; *See* ENV'T PROT. AGENCY, Glyphosate Executive Summary for Biological Evaluation, 2-3, https://www.epa.gov/endangered-species/final-national-level-listed-species-biological-evaluation- glyphosate#executive-summary [hereinafter BE Executive Summary]

[4] CFS Petition at 1; U.S. GEOLOGICAL SURVEY, Pesticide National Synthesis Project, https://water.usgs.gov/nawqa/pnsp/usage/maps/show_map.php?year=2019&map=ATRAZINE&hilo=L&disp =Atrazine.

increased roughly 10-fold since the introduction of Monsanto's genetically engineered, "Roundup Ready", glyphosate-resistant crops in the mid-1990s.[5]

28.    Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., "Roundup Ready®." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

29.    The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.[6]

30.    For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

31.    The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

32.    The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in

---

[5] *Id.*

[6] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

33.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

34.     The EPA and the State of Tennessee registered Roundup for distribution, sale, and manufacture in the United States and the State of Tennessee.

35.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

36.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1.In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

37.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015, finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

38.     To date, glyphosate remains registered under FIFRA, despite EPA's continued failure to properly analyze the full effects of current glyphosate use, and a wealth of evidence demonstrating glyphosate cannot meet FIFRA's required safety standard: no unreasonable adverse effects on the environment. EPA's recent efforts to prove glyphosate meets this standard failed miserably and

7

resulted in the withdrawal of its interim registration review decision (IRRD). The Ninth Circuit found EPA's human health risk assessment, specifically its cancer safety finding, deficient and incapable of supporting the conclusion that glyphosate poses "no risks to human health."[7] In response, EPA withdrew its IRRD, and furthermore openly admitted glyphosate's ecological risk assessment requires further evaluation and that additional mitigation measures may be necessary to safeguard the environment.[8]

39.      As things now stand, EPA's human health assessment of glyphosate has been held unlawful and set aside, and the remainder of the IRRD has been withdrawn. Accordingly, glyphosate's current registrations rely on the 1993 Reregistration Eligibility Decision (RED).[9]

40.      Monsanto has acknowledged  the risks and dangers of Roundup by announcing it will remove glyphosate from all residential products beginning in 2023.[10]

41.      Bayer's announcement that it would pull glyphosate for residential use came in July 2021, and was not motivated by a concern for human or environmental health, but rather according to Bayer is part of a larger "five-point plan" to "close the door on this litigation" and "ensure that any

---

[7] *CFS/Nat. Res. Def. Council v. U.S. Env't Prot. Agency,* 38 F.4th 34, 50-51 (9th Cir. 2022). "The evidence demonstrating that glyphosate causes cancer has only grown stronger since the Ninth Circuit vacated OPP's human health risk assessment." CFS Petition at 2.

[8] CFS Petition at 2; *EPA Withdraws Glyphosate Interim Decision* (Sept. 23, 2022), https://www.epa.gov/pesticides/epa-withdraws-glyphosate-interim-decision.

[9] CFS Petition at 2*;* ENV'T PROT. AGENCY, Reregistration Eligibility Decision (RED) (Sept. 1993), https://www3.epa.gov/pesticides/chem_search/reg_actions/reregistration/red_PC-417300_1-Sep-93.pdf.

[10] CFS Petition at 36; Gil Gullickson, *Bayer to discontinue lawn and garden market glyphosate-based products starting in 2023* (July 29, 2021), https://www.agriculture.com/news/business/bayer-to-discontinue-lawn-and-garden- market-glyphosate-based-products-starting-in-2023.

claims brought by individuals who use Roundup™ in the future are few in number and unlikely to succeed."[11]

### MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®

42.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" [;] it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

---

[11] CFS Petition at 36; BAYER, *Bayer Provides Update on Path to Closure of Roundup™ Litigation* (2021), https://www.bayer.com/media/en-us/bayer-provides-update-on-path-to-closure-of-rounduptm-litigation/.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[12]

43. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

44. On June 15, 2023, the NY AG fined Monsanto $6.9 million dollars for false and deceptive ads claiming that Roundup products "won't harm anything but weeds," "do not pose a threat to

---

[12] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

the health of animal wildlife," and permit farmers to "protect the environment for insects, birds and wildlife" including "pollinator species," among similar false claims.[13]

45.     Monsanto's false representations concerning safety are evidenced by relentless decades-long advertising campaign that made numerous false claims touting the supposed human and environmental safety of Roundup. These safety claims were banned as false and misleading by the New York State Attorney General in at least three separate actions in 1996, 1998, and 2023.[14]Nevertheless, this messaging has given rise to a lack of care in preventing dermal exposure among those who apply glyphosate products.

46.     As a result of Monsanto's false advertising and false representations, Roundup users, including Danny Stephens, took no measures to reduce dermal exposure.[15]

47.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[16]

---

[13] https://ag.ny.gov/press-release/2023/attorney-general-james-secures-69-million-bayer-and-monsanto-false-
advertising#:~:text=The%20settlement%20also%20requires%20Bayer,to%20pollinators%20and
%20other%20wildlife.

[14] CFS Petition at 36; Attorney General of the State of New York, In the matter of Monsanto Company, Assurance of discontinuance pursuant to executive law § 63(15) (1996); Attorney General of the State of New York, In the matter of Monsanto Company, Assurance of discontinuance pursuant to executive law § 63(15) (1998);  Investigation by Letitia James, Attorney General of the State of New York, of Bayer CropScience LP and Monsanto Company, Assurance of Discontinuance 8, 9, 11 (2023).

[15] *See e.g., Hardeman v. Monsanto Co.*, No. C 16-00525-VC (N.D. Cal. 2019); *Hardeman v. Monsanto Co.,* 997 F.3d 941, 963 (9th Cir. 2021), *cert. denied*, 213 L. Ed. 2d 1064, 142 S. Ct. 2834 (2022) (affirming district court's finding of liability).

[16] Monsanto Guilty in 'False Ad' Row, BBC, Oct. 15, 2009, available at http://news.bbc.co.uk/2/hi/europe/8308903.stm.

11

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

48.     The medical scientific community overwhelmingly agrees that glyphosate is a probable carcinogen and that there is strong epidemiological evidence of an association between glyphosate exposure and NHL.[17]

49.     Evidence of glyphosate's carcinogenicity continues to accumulate on all fronts. Two recent meta-analyses corroborate the findings of increased NHL risk in farmers. In one extremely large study, 2,430 cases of NHL diagnosed in over 300,000 farmers in the U.S., France, and Norway were pooled and analyzed, and glyphosate exposure was associated with a 36% greater risk of diffuse large B-cell lymphoma, the most common subtype of NHL.[18]

50.     Another meta-analysis analyzed those applicators who, in each of the six underlying epidemiology studies, had the highest cumulative exposure to glyphosate, finding a 41% increased risk of NHL in this more highly exposed group.[19]

51.     A comprehensive re-analysis of 13 rodent carcinogenicity bioassays concluded that they provided clear  evidence glyphosate caused malignant lymphomas, hemangiosarcomas, kidney tumors and liver tumors, as well as carcinomas of the adrenal gland and skin tumors.[20]

---

[17] CFS Petition at 53.

[18] CFS Petition at 30; M.E. Leon et al., Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway and the USA: a pooled analysis from the AGRICOH consortium, 48 INT'L J. OF EPIDEMIOLOGY 1519, 1519-35 (2019).

[19] CFS Petition at 30; L. Zhang, I. Rana, E. Taioli, R.M. Schaffer, L. Sheppard, Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence, 781 MUTATION RESEARCH 186, 186-206 (2019).

[20] CFS Petition at 30-31; C. Portier, A comprehensive analysis of the animal carcinogenicity data for glyphosate from chronic exposure rodent carcinogenicity studies, 19 Environmental Health 1, 1-18 (2020).

12

52.     A review of genotoxicity studies published since IARC's decision found that 82 of 94 determined that glyphosate was genotoxic, that is, capable of causing cancer- predisposing changes in cells.[21]

53.     Likewise, a review of 175 studies found that glyphosate and its formulations have 5 of 10 key characteristics of carcinogens.[22]

54.     One of these characteristics is glyphosate's ability to induce DNA-damaging oxidative stress,[23] which is implicated especially in blood cell cancers such as non-Hodgkin lymphoma.[24]

55.     In a state- of-the-art molecular epidemiology study conducted by U.S. National Institutes of Health scientists, farmers with recent or long-term exposure to glyphosate formulations had higher levels of urinary biomarkers of oxidative damage to DNA and/or lipids, which supports the association between glyphosate and NHL.[25]

---

[21] CFS Petition at 31; Charles Benbrook, Robin Mesnage, William Sawyer, Genotoxicity assays published since 2016 shed new light on the oncogenic potential of glyphosate-based herbicides, 2 AGROCHEMICALS 47, 47-68 (2022).

[22] CFS Petition at 31; Iemaan Rana et al., Mapping the key characteristics of carcinogens for glyphosate and its formulations: a systematic review, 339 CHEMOSPHERE 139572 (2023).

[23] CFS Petition at 31; Xiaojing Wang et al., Oxidative stress and metabolism: a mechanistic insight for glyphosate toxicology, 62 ANNUAL REVIEW OF PHARMACOLOGY AND TOXICOLOGY 617, 617-639 (2022).

[24] CFS Petition at 31;Alba Rodriguez-Garcia et al., Protein carbonylation and lipid peroxidation in hematological malignancies, 9 ANTIOXIDANTS 1212 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7761105/.

[25] CFS Petition at 31; Vicky C. Chang et al., Glyphosate exposure and urinary oxidative stress biomarkers in the Agricultural Health Study, 115 J. NATIONAL CANCER INSTITUTE 394, 394-404 (2023).

56.     Similar findings have been made in Thai[26] and Brazilian[27] farmers, as well as in pregnant women in Puerto Rico[28] and school children in Cyprus.[29]

58.     NHL expert Dr. Dennis Weisenburger observes that glyphosate herbicides induce forms of DNA damage that lead to NHL in lymphocytes, "the normal cell of origin of NHL,"[30] including DNA double strand breaks,[31] chromosomal aberrations and micronuclei.[32]

---

[26] CFS Petition at 31;  Sutthinee Sidthilaw et al., Effects of exposure to glyphosate on oxidative stress, inflammation, and lung function in maize farmers, Northern Thailand, BMC PUBLIC HEALTH 22: 1343 (2022).

[27] CFS Petition at 31; Aline de Souza Espindola Santos et al., Exposure to pesticides and oxidative stress in Brazilian agricultural communities, Biomarkers (2021).

[28] CFS Petition at 31; Jarrod L. Eaton et al., The association between urinary glyphosate and aminomethylphophonic acid with biomarkers of oxidative stress among pregnant women in the PROTECT birth cohort study, ECOTOXICOL ENVIRON SAF 233:113300 (2022).

[29] CFS Petition at 31; Konstantinos C Makris et al., Oxidative stress of glyphosate, AMPA and metabolites of pyrethroids and chlorpyrifos pesticides among primary school children in Cyprus, ENVIRONMENTAL RESEARCH 212: 113316 (2022).

[30] CFS Petition at 31; Dennis D. Weisenburger, A review and update with perspective of evidence that the herbicide glyphosate (Roundup) is a cause of non-Hodgkin lymphoma, Clinical Lymphoma, Myeloma and Leukemia, 21 CLINICAL LYMPHOMA, MYELOMA AND LEUKEMIA 621, 626, 621-30 (2021).

[31] CFS Petition at 31; See generally Karen Suarez-Larios et al., Screening of pesticides with the potential of inducing DSB and successive recombinational repair, J. OF TOXICOLOGY, Article ID 3574840 (2017).

[32] CFS Petition at 31; See generally Alfredo Santovito et al., In vitro evaluation of genomic damage induced by glyphosate on human lymphocytes, 25 ENV'T SCI. & POLLUTION RESEARCH 34693, 34693-700 (2018).

59.     Other research demonstrates that a glyphosate formulation causes similar DNA damage in peripheral mononuclear blood cells,[33] and glyphosate alone triggers epigenetic changes in lymphoma-related genes,[34] among other NHL-relevant genetic damage.[35]

60. Glyphosate poses risk of an oncogenic effect which is of concern based on the herbicide's inducement of tumors in experimental animals and genotoxic effects, together with a strong epidemiological association with NHL in farmers. [36]

61.     Evaluation of this evidence by qualified experts with the International Agency for Research on Cancer, and scientists with EPA's Office of Research and Development, resulted in a determination that glyphosate is probably or likely carcinogenic to humans. Moreover, glyphosate's extensive and intensive use as the most heavily applied pesticide in the country means large numbers of people are exposed, with users of glyphosate formulations, including but not limited to farmers, farmworkers, and landscapers, subjected to particularly high exposures via dermal absorption.[37]

---

[33] CFS Petition at 32; Ewelina Wozniak et al., The mechanism of DNA damage induced by Roundup 360 PLUS, glyphosate and AMPA in human peripheral blood mononuclear cells – genotoxic risk assessment, 120 FOOD AND CHEMICAL TOXICOLOGY 510, 510-522 (2018).

[34] CFS Petition at 32; Ewelina Wozniak et al., Glyphosate affects methylation in the promoter regions of selected tumor suppressors as well as expression of major cell cycle and apoptosis drivers in PBMCs (in vitro study), 63 TOXICOLOGY IN VITRO 104736 (2020).

[35] CFS Petition at 32; Lei Wang et al, Glyphosate induces benign monoclonal gammopathy and promotes multiple myeloma progression in mice, 12 J. HEMATOLOGY & ONCOLOGY 70 (2019).

[36] CFS Petition at 60.

[37] Id.

62.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[38] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

63.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87- 103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[39]

64.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[40]

65.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.[41] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[42]

66.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

67.     The study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

---

[38] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

[39] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf

[40] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.

[41] Martinez et al. 2007 ; Benachour 2009 ; Gasnier et al. 2010 ; Peixoto 2005 ; Marc 2004.

[42] Martinez et al 1991.

16

68.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation". The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

69.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[43]

70.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

71.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

72.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

73.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert, and that Roundup is always more toxic than its active ingredient glyphosate.

---

[43] (Molinari, 2000 ; Stewart et al., 2003)

74.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

75.     Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

76.     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

77.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup. 58. Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Plaintiff and the consuming public.

78. Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

79.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer. IARC has been the world's leading authority on carcinogenic agents since the 1970s, and is funded by the governments of 24 countries, including through grants from the U.S. National Cancer Institute and the Environmental Protection Agency.[44]

80.     Glyphosate was classified as "probably carcinogenic in humans" (Group 2A) by the International Agency for Research on Cancer (IARC) in 2015, on the basis of evidence for an association with non-Hodgkin lymphoma (NHL) in humans, sufficient evidence of carcinogenicity

---

[44] CFS Petition at 7; *see* Neil Pearce et al., *IARC Monographs: 40 Years of Evaluating Carcinogenic Hazards to Humans,* 123 ENV'T HEALTH PERSPS 507, 507- 514 (2015).

in laboratory animals, and strong mechanistic evidence of genotoxicity and oxidative stress in human cells and animals.[45]

81.     The IARC noted: "In summary, case–control studies in the USA, Canada, and Sweden reported increased risks for NHL associated with exposure to glyphosate. The increased risk persisted in the studies that adjusted for exposure to other pesticides."[46]

82.     The IARCC concluded:

**6.   Evaluation**

**6.1   Cancer in humans**

There is *limited evidence* in humans for the carcinogenicity of glyphosate. A positive association has been observed for non-Hodgkin lymphoma.

**6.2   Cancer in experimental animals**

There is *sufficient evidence* in experimental animals for the carcinogenicity of glyphosate.

**6.3   Overall evaluation**

Glyphosate is *probably carcinogenic to humans (Group 2A).*

[47]

83     The IARC defined "Limited evidence of carcinogenicity" to mean "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence."[48]

---

[45] IARC Working Group on the Evaluation of Carcinogenic Risks to Humans. 2017. *Some organophosphate insecticides and herbicides.* IARC Monogr Eval Carcinog Risks Hum 112:1–464, available at https://publications.iarc.fr/549.

[46] *Id.* at 395.

[47] *Id.* at 398.
[48] *Id.* at 27.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

84.     Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's toxic properties for decades.

85.     EPA once recognized glyphosate as a liver, reproductive, and kidney toxin, as well as a possible carcinogen.[49]

86.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

87.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

88.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

89.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

90.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

91.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

92.      In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

---

[49] CFS Petition at 1; See *Center for Food Safety, Comments to EPA on Proposed Interim Registration Decision for Glyphosate,* Sept. 3, 2019, pp. 12-14; ENVT PROT. AGENCY, *Consensus Review of Glyphosate* (March 4, 1985), https://archive.epa.gov/pesticides/chemicalsearch/chemical/foia/web/pdf/103601/103601-171.pdf.

93.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

94.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

95.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

96.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

97.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

98      Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

99.     In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

100.    In 2003 Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

101.    The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

102.    In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

103   The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

104.   In 2008 Mikael Eriksson published a population-based case-control study of exposure to various pesticides as a risk factor for NHL.

105.   This strengthened previous associations between glyphosate and NHL.

106.   In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

107.   Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase and increase the use of Defendant's Roundup for Defendant's pecuniary gain, and in fact, did induce Plaintiff to use Roundup.

108.   Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

109.   Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

110.   Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

111.   Defendant failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

112.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

113.     Defendant has claimed and continues to claim that Roundup is safe, non- carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiff.

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY DETERMINATIONS OF GLYPHOSATE

114.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

115.     This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

116.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

117.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

118.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

119.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts

of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

120.    Three top executives of IBT were convicted of fraud in 1983.

121.    In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

122.    In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

123.    The investigation led to the indictments of the laboratory owner and a handful of employees.

124.    The Center for Food Safety's December 2023 Petition detailed that the EPA's assessment of the safety of Roundup is not based upon independent peer-reviewed studies and publications but is instead premised on studies by glyphosate manufacturers:

> The human health and ecological risk assessments underlying EPA's interim registration review decision are based entirely on studies conducted or sponsored by glyphosate manufacturers (aka registrants), not on peer-reviewed studies by independent scientists. While EPA describes some independent studies in its assessments, they played no role in its formal, quantitative risk assessments.
>
> In the case of human health, EPA identified 466 potentially relevant, peer-reviewed studies from about 2011 through 2015, but rejected all of them as "unacceptable" for use in risk assessment, with one major factor in the rejections being that the studies employed commercial glyphosate formulations rather than the pure active ingredient.[177]
>
> With respect to glyphosate's ecological toxicity, EPA identified 1,880 peer-reviewed studies in its ECOTOX database,[178] but did not utilize a single one of them in its quantitative estimation of risk.[179] EPA's dismissal of quality independent peer reviewed studies on mostly spurious grounds in favor of registrant studies, where conflicts of interest present obvious motivations for bias and fraud, is unacceptable,[180] and leads the Agency to miss or downplay many of glyphosate's harmful effects.

[177] DRAFT HUMAN HEALTH RISK ASSESSMENT, supra note 122, at 10-11 (describing two literature searches conducted at different times that turned up 67 and 399

studies).

178 For a description of ECOTOX, see https://cfpub.epa.gov/ecotox/help.cfm?sub=so-site-info.

179 EPA, Appendix G: Bibliography of Ecotox Papers, https://www.regulations.gov/document/EPA-HQ-OPP- 2009-0361-0078 (listing 609 studies "acceptable for both ECOTOX and OPP [Office of Pesticide Programs]" and 1,271 studies "acceptable for ECOTOX but not OPP").

180 JR Rohr & KA McCoy, Preserving environmental health and scientific integrity: a practical guide to reducing conflicts of interest, 3 Conservation Letters 143, 143-50 (2010).[50]

125.     Monsanto also committed scientific fraud by ghost writing scientific papers to improperly skew safety and risk scientific information in its favor.[51]

## MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF PLAINTIFF AND THE PUBLIC

126.     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[52]

---

[50] CFS Petition at 26.

[51] A. Matheson, *The "Monsanto papers" and the nature of ghostwriting and related practices in contemporary peer review scientific literature*, Account Res., 2023 Jul 17:1-30. doi: 10.1080/08989621.2023.2234819. Available at: https://pubmed.ncbi.nlm.nih.gov/37424374/#:~:text=The%20Monsanto%20company%20%2D% 20now%20acquired,defence%20of%20the%20herbicide%20Roundup. Joel Rosenblatt, Lydia Mulvany & Peter Waldman, BLOOMBERG, *EPA official accused of helping Monsanto 'kill' cancer study* (March 14, 2017), available at: https://www.bloomberg.com/news/articles/2017-03-14/monsanto-accused-of-ghost-writing-papers-on-roundup-cancer-risk; McHenry LB. The Monsanto Papers: Poisoning the scientific well. Int J Risk Saf Med. 2018;29(3-4):193-205. doi: 10.3233/JRS-180028. PMID: 29843257, available at: https://pubmed.ncbi.nlm.nih.gov/29843257/#:~:text=Results%3A%20The%20documents%20rev eal%20Monsanto,the%20defense%20of%20Monsanto%20products.

[52] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9, 2015).

25

127. Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

128. Glyphosate, and Defendant's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

129. Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

130. Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

131. Defendant's failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

132. Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

133. The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

134. The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

135. The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

136. By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of and exposure to Roundup, which caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically large B-cell NHL and Plaintiff suffered severe and personal injuries, physical pain, and mental anguish, including diminished enjoyment of life. His

wife, Lisa Stephens, has suffered and sustained loss of consortium damages as a direct and proximate result of Defendant's defective product.

137. By reason of the foregoing, Plaintiff is severely and permanently injured.

138. By reason of the foregoing acts and omissions, Plaintiff has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant. His wife, Plaintiff Lisa Stephens, has suffered and sustained loss of consortium damages as a direct and proximate result of Defendant's defective product.

## PLAINTIFF'S EXPOSURE TO ROUNDUP

139. Plaintiff Danny Stephens used Roundup beginning in approximately 2008.

140. From 2008-2020 , Plaintiff sprayed Roundup on a regular basis. Plaintiff followed all safety and precautionary warnings during the course of use.

141. Plaintiff was subsequently diagnosed with large B-cell NHL on April 25, 2018.

142. The development of Plaintiff's Non-Hodgkin's Lymphoma was proximately and actually caused by exposure to Defendant's Roundup products. As a result of his injury, Plaintiff has incurred significant economic and non- economic damages.

## TOLLING OF APPLICABLE LIMITATIONS PERIODS

143. Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

144. Plaintiffs and Monsanto entered into a tolling agreement on January 8, 2020, that tolled any applicable limitations period. On January 8, 2020, Plaintiffs gave written notice, pursuant to the written tolling agreement to terminate the tolling agreement and file suit.

145. This suit is therefore timely filed.

146.    The running of any statute of limitations has also been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate.

147.    At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

148.    Indeed, even as of July 2016, Defendant continues to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).[53]

149.    As a result of Defendant's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

150.    Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

151.    Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide,

---

[53] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9, 2015)

notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

**FIRST CAUSE OF ACTION**
**(NEGLIGENCE)**

152.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

153.   Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

154.   Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

155.   The negligence by the Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

   a. Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

   b. Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

29

c. Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendant herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d. Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

e. Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f. Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g. Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i. Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j. Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k. Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l. Negligently designing Roundup in a manner, which was dangerous to its users;

m. Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n. Negligently producing Roundup in a manner, which was dangerous to its users;

o. Negligently formulating Roundup in a manner, which was dangerous to its users;

p. Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

30

q. Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r. Negligently selling Roundup with a false and misleading label.

156. Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

157. Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

158. Defendant was negligent and/or violated Tennessee law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a. Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b. Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c. Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d. Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e. Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f. Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g. Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h. Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

i. Was otherwise careless and/or negligent.

31

159.     Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

160.     Defendant knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

161.     Defendant's violations of law and/or negligence were the proximate cause of Plaintiff' injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

162.     As a result of the foregoing acts and omissions, the Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.  His wife, Plaintiff Lisa Stephens, has suffered and sustained loss of consortium damages as a direct and proximate result of Defendant's defective product.

        WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY – DESIGN DEFECT)

163.     Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

164.     At all times herein mentioned, the Defendant designed, researched, manufactured, tested, advertised, promoted, sold, distributed Roundup as hereinabove described that was used by the Plaintiff.

165.     Defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

166.     At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

167.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

168.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of the Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

169.     At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant. In particular, Defendant's Roundup was defective in the following ways:

      a. When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

      b. When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

33

c. When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d. Defendant did not sufficiently test, investigate, or study its Roundup products.

e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Defendant new or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

g. Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

170. Defendant knew, or should have known, that at all times herein mentioned its Roundup was in a defective condition and was and is inherently dangerous and unsafe.

171. Plaintiff was exposed to Defendant's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

172. At the time of the Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

173. Defendant with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff.

174. Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

175. Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

176. Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

177. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

178. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached its intended users in the same defective and unreasonably dangerous condition in which the Defendant's Roundup was manufactured.

179. Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendant is therefore strictly liable for the injuries sustained by the Plaintiff.

180. The Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

181. By reason of the foregoing, the Defendant has become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

182. Defendant's defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

183. Defects in Defendant's Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

184. As a result of the foregoing acts and omission, the Plaintiff developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care. His wife, Plaintiff Lisa Stephens, has suffered and sustained loss of consortium damages as a direct and proximate result of Defendant's defective product.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## THIRD CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY – FAILURE TO WARN)

185.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

186.     Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

187.     Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff. Additionally, Defendant expected the Roundup that it was selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

188.     At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

189.     At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user and was so at the time it was distributed by Defendant and at the time Plaintiff was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

190.     Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

36

191.     Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of Tennessee.

192.     Defendant could have amended the label of Roundup to provide additional warnings.

193.     This defect caused serious injury to Plaintiff, who used Roundup in its intended and foreseeable manner.

194.     At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

195.     Defendant labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

196.     Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

197.     Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Plaintiff.

198.     At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

199.     Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

200.     Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

201.     Had Defendant properly disclosed the risks associated with Roundup products, Plaintiff would have avoided the risk of NHL by not using Roundup products.

202.     The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

203.     To this day, Defendant has failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

204.     As a result of its inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

205.     As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged.

        WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## FOURTH CAUSE OF ACTION
## (BREACH OF IMPLIED WARRANTIES)

206.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

207.    At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup as a broad- spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

208.    At the time Defendant marketed, sold, and distributed Roundup for use by Plaintiff, Defendant knew of Roundup's intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

209.    The Defendant impliedly represented and warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

210.    These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

211.    Plaintiff and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

212.    Plaintiff reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

213.         Roundup was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

214. The Defendant breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

39

215.    As a result of the foregoing acts and omissions, Plaintiff suffered from NHL and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non- economic damages. His wife, Plaintiff Lisa Stephens has suffered and sustained loss of consortium damages as a direct and proximate result of Defendant's defective product.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## FIFTH CAUSE OF ACTION
## (BREACH OF EXPRESS WARRANTY)

216.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

217.    At all relevant and material times, Defendant manufactured, distributed, advertised, promoted, and sold Roundup.

218.    At all relevant times, Defendant intended that the Defendant's Roundup be used in the manner that Plaintiff used it, and Defendant expressly warranted that each Roundup product was safe and fit for use by consumers, that it was of merchantable quality, that its health and side effects were minimal, and that it was adequately tested and fit for tis intended use.

219.    At all relevant times, Defendant was aware that consumers, including Plaintiff, would use Roundup products; which is to say that Plaintiff was a foreseeable user of the Defendant's Roundup products.

220.    Plaintiff purchased Roundup manufactured by Defendant.

40

221. Defendant's Roundup products were expected to reach and did in fact reach consumers, including Plaintiff, without any substantial change in the condition in which it was manufactured and sold by Defendant.

222.    Defendant expressly warranted that Roundup was safe and not dangerous to users.

223.    Defendant expressly represented to Plaintiff, scientists, the agricultural community, and/or the EPA that Roundup was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce dangerous side effects in excess of those risks associated with other forms of herbicides, that the side effects it did produce were accurately reflected in the warnings, and that it was adequately tested and fit for its intended use.

224.    Defendant breached various express warranties with respect to Roundup including the following particulars: a) Defendant Monsanto's website expressly states that "[r]egulatory authorities and independent experts around the world have reviewed numerous long term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate based herbicides, causes cancer, even at very high doses, and that it is not genotoxic"[54] b) Defendant has expressly warrantied that Roundup is "safer than table salt" and "practically nontoxic."[55]

225.    Roundup did not conform to these express representations because Roundup was not safe and had, at all relevant times, an increased risk of serious side effects, including non-Hodgkin's lymphoma, when used according to Defendant's instructions.

226.    Defendant fraudulently concealed information from Plaintiff regarding the true dangers and relative risks of Roundup.

227.    The global scientific community is not, and was never, in agreement that Roundup is non-carcinogenic.

---

[54] http://www.monsanto.com/glyphosate/documents/no-evidence-of-carcinogenicity.pdf October 8, 2015
[55] Reuters, Jun 14, 2015, UPDATE 2-French minister asks shops to stop selling Monsanto Roundup weedkiller.

228.    Plaintiff did rely on the express warranties of the Defendant herein.

229.    Plaintiff, consumers, and members of the agricultural community relied upon the representation and warranties of the Defendant for use of Roundup in recommending, using, purchasing, mixing, handling, applying, and/or dispensing Roundup.

230.    The Defendant herein breached the aforesaid express warranties, as its product Roundup was defective.

231.    Defendant knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that Roundup was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendant.

232.    Defendant knew or should have known that, in fact, said warranties were false, misleading, and untrue in that there is evidence that Roundup is toxic, genotoxic, and carcinogenic and that scientists and/or regulatory authorities around the world are not in agreement that Roundup is not carcinogenic or genotoxic and that it is safe.

233.    As a result of the foregoing acts and omissions, the Plaintiff suffered from life threatening NHL and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

234.    As a result of the foregoing acts and omissions, Plaintiff have suffered and incurred damages, including medical expenses and other economic and non-economic damages. His wife, Plaintiff Lisa Stephens, has suffered and sustained loss of consortium damages as a direct and proximate result of Defendant's defective product.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against the Defendant on each of the above-referenced claims and causes of action and as follows:

1.      Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life for Plaintiff Danny Stephens and for loss of consortium damages for Lisa Stephens; and other non- economic damages in an amount to be determined at trial of this action;

2.      Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs and economic loss;

3.      Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4.      Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law;

5.      Pre-judgment interest;

6.      Post-judgment interest;

7.      Awarding Plaintiffs  reasonable attorneys' fees;

 8.      Awarding Plaintiffs the costs of these proceedings; and

 9.      Such other and further relief as this Court deems just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs hereby demand a trial by jury as to all issues.

43

## TRANSFER TO MASTER DOCKET

Plaintiffs request for this case to be transferred to the United States Judicial Panel on Multidistrict Litigation Master Docket, under the style "In re: Roundup Products Liabilities Litigation," MDL No. 2741, assigned to the Northern District of California.

Respectfully Submitted,

**DRS Law**

/s *David Randolph Smith*
David Randolph Smith (TN Bar # 011905)
drsw@drslawfirm.com
Dominick Randolph Smith (TN Bar# 028783)
dom@drslawfirm.com
1913 21st Avenue South
Nashville, Tennessee 37212
Tel.: (615) 742-1775
Facsimile: (615) 742-1223
http://www.drslawfirm.com